IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BARBARA J. DUKE, Executrix of )
The Estate of Thelma Edgar, )
        )
     Plaintiff, )
        )
v. )        2:03-CV-00934-DRB
        )           [WO]
ATRIA, INC., )
        )
     Defendant. )

**MEMORANDUM OPINION *AND***
**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Following careful consideration of the evidentiary record, supporting and opposing submissions,[1] and controlling law, the Court concludes that Defendant *Atria, Inc.'s Motion for Summary Judgment* (Doc. 60, March 30, 2005) is due to be granted.

**I.**

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.

---

[1]Atria supports this summary judgment motion with not only a narrative summary of undisputed facts, a brief, and an evidentiary submission but also its Federal Rule of Evidence Rule 104 Motion regarding the inadmissibility of plaintiff's proposed expert testimony. Duke responds in opposition with a memorandum brief (Doc. 76) and evidentiary exhibits (Doc. 77 as corrected by Doc. 90) which are the subject of Atria's motion to strike(Doc.84). In concurrently filed opinions, the Court rules on Rule 104 Motions filed by both parties as well as Atria's challenges to Duke's evidentiary submissions in opposition to summary judgment. Though the Court sustains Atria's objection to Duke's submission of its Statement of Uncontested Facts as an evidentiary exhibit, it does consider this statement along with any admissible evidentiary support pursuant to its duty to accept the non-movant's evidence as true, resolve all doubts against the movant, construe all evidence most favorably to the non-movant, and draw all reasonable inferences in the non-movant's favor.

P. 56(c).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of "the pleadings and evidentiary record" which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present sufficient evidence to establish an essential element of the non-moving party's claim.  *Celotex* at 331.  As the Supreme Court instructed in *Celotex, 477 U. S. at 323,* "the plain language of Rule 56(c) mandates the entry of summary judgment . . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." In response to a properly supported motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits, or as otherwise provided .... must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

The court's role is neither to weigh the evidence nor to find the facts; instead, it is "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues  that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986).  Substantive law will identify those facts which are material on motions for summary judgment.  *Id. at* 258.

The court must accept the evidence of the non-moving party as true, resolve all doubts against the moving party, construe all  evidence in the light most favorable to the non-moving party,

and draw all reasonable inferences in the non-moving party's favor. *Hunt v. Cromartie,* 526 U.S. 541, 550-55 (1999); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, summary judgment is not warranted because the trier of fact is entitled to decide which inference to believe. *Hunt v. Cromartie,* 526 U.S. at 552*; Patterson & Wilder Const. Co., Inc. v. U.S.,* 226 F.3d 1269, 1273 (11th Cir. 2000).

## II.

## FACTS

As decided by the Court on December 1, 2004 (Doc.50),  the Alabama Medical Liability Act ("AMLA"), § 6-5-481 *et seq*., governs this liability action for personal injuries suffered by Thelma Edgar ("Edgar") on September 3, 2002, when she slipped and fell in her bathroom at Halcyon, an assisted living facility  then owned by Atria.  A  resident only since August 23, 2002, Edgar never returned to the facility after receiving treatment elsewhere for her injuries.  She died on October 15, 2003, before giving a deposition in this lawsuit she initiated in state court approximately a month earlier.  It is undisputed that Edgar died of natural causes and not from the injuries suffered in the fall.  In her capacity as  Administratix of her mother's estate, successor-plaintiff Barbara Duke ("Duke")  claims damages for Edgar's medical expenses, mental anguish, physical pain and suffering allegedly  resulting proximately from Edgar's fall.

Atria's staff and Dr. Walter T. Geary, Jr.,  Edgar's primary care physician, assessed her suitability for Halcyon.[2]  Based on Edgar's physical examination  on August 8, 2002, Dr. Geary

---

[2]Edgar resided without incident at two assisted living facilities – Wesley Gardens and Angels for the Elderly – before relocating to Halcyon.  Dep. of Barbara Duke ("*Duke Dep.*") at 19-21( *Pl.'s*
(continued...)

certified her as "appropriate" for the assisted living facility and assessed as follows the impact of her physical limitations on her activities of daily living:  "needs supervision" for ambulating, bathing, dressing, transferring, and medication;  "independent" for eating; and  "needs assistance of 1" for grooming and  toileting.  In his judgment, she did not require either "assistance of one person during the night" or "her physical location monitored closely."[3]   Daria McCord Robinson, an LPN assigned for a first-time assessment of Edgar, found her not incontinent, able to feed herself with moderate assistance, in need of "major assistance" for dressing as well as assistance with grooming, bathing, and ambulation; she expressed to the administrator her opinion that Edgar presented a high risk for falls.[4] Because Edgar was not a dementia patient, Halcyon admitted her to its "standard" assisted living unit instead of the "specialty care" unit, and  Duke agreed with this placement into "the highest level [for care] before you go to the dementia unit." [5]

Undisputed is that Lula Woods ("Woods"), an Atria employee in training to be a certified nurse assistant, was assigned as Edgar's caregiver at the time of the incident in controversy.  Having reported to work on the preceding night for the evening shift ending  at 7:00 a.m. on September 3, 2002,  Woods provided this recollection on April 7, 2005:

> I do not remember everything that happened since it was so long ago, but I do remember that while I was getting Mrs. Edgar bathed and dressed to go to breakfast,

---

[2](...continued)
*Ex*.3).

[3] *See* Dr. Geary's "Physician's Statement and Report" (*Pl.'s Ex.18*; *Def.'s Ex.9* to deposition excerpts included in *Ex. 1*). This report listed no "mental health limitations" but cited "hypothyroidism, depression, osteoporosis, and generalized weakness" among Edgar's "physical limitations"

[4]Dep. of Daria McCord Robinson at 46-49 (*Pl.'s Ex.* 2).

[5]*McCord Robinson Dep.* at 141, 149-151 (*Def.'s Ex.*5); *Duke Dep.* at 90-91 (*Def.'s Ex.3*).

she was standing at the bathroom sink and I was getting her pants on.  I had asked
her to lift her legs and put her pants on while she was standing.  Mrs. Edgar lost her
balance and she fell on the floor hitting her head on the tile floor.  She was bleeding
from the back of her head.  I called to the other lady who was working and asked her
to help me dress Mrs. Edgar and put her in her wheelchair.  Which she did.  I then
left Mrs. Edgar to go help other residents get to breakfast.[6]

That Edgar fell and the location of her fall are both undisputed facts for the summary judgment

record.[7]

## III.

## DISCUSSION

### A.    Liability Claims and Parameters of Expert Testimony

Duke's complaint states "fraud and contract claims [which] rest on allegations similar to

those underlying her negligence claims, and they hinge on whether Atria provided, *inter alia*, the

proper services and treatment to Edgar.  The damages demanded are essentially the same for each

claim.  Indisputably, the substance of Plaintiff's fraud and contract claims is malpractice and they

fall, therefore, within the ambit of the AMLA."[8]

Duke asserts four theories of liability and summarizes as follows Atria's culpable acts and

omissions:

*A claim for negligence* in which she alleged that Atria failed to sufficiently staff the
facility, failed to properly train the employees and failed to supervise the employees
who were providing care to Mrs. Edgar. . . .   The *second count* . . . *claims
wantonness, gross negligence and negligence* . . .Atria employees knew she was a
high risk for falls and injury, and it provided unskilled labor, untrained staff to assist
her with activities of daily living . . . .  Mrs. Edgar's *breach of contract claim* alleges
that Atria was not equipped ...at the time of her contract and admission into the

---

[6]Corrected Affidavit of Lula Woods ("*Woods Aff.*") at 3 (Doc. 90, April 28, 2005)

[7]Atria's *Mot.*, Narrative Statement of Undisputed Facts, ¶ 3.

[8]*Order* filed Dec.1, 2004 (Doc. 50) at 6 (citations omitted).

facility . .. to provide the care and services required ... and accepted her into the facility. .. . . Atria ...made *material representations* to induce Mrs. Edgar and her daughter Barbara Duke into signing a contract with Atria for services. . . . [and they] detrimentally relied on the representations....[9]

(emphasis supplied).

Duke cannot succeed on any of these liability claims without establishing by expert testimony both the standard of care owed by Atria to Edgar and a breach of that standard which resulted proximately in the physical injuries and damages claimed. "To establish breach of the applicable standard of care, the plaintiff in a medical malpractice action must generally produce expert medical testimony establishing the appropriate standard of care, the health care provider's deviation from that standard, and a causal connection between the breach of the standard and plaintiff's injury." *Watson v. Aldrete,* No. 02-T-137-S, 2002 U.S. Dist. LEXIS 25778, *8 (M.D. Ala. Aug. 23, 2002); *see Chapman v. Smith*, 893 So. 2d 293 (Ala. 2004); *Vaughn v. Oliver,* 822 So. 2d 1163, 1168 (Ala. 2001) ("In medical-malpractice cases, the plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience.").

In the memorandum opinions and orders filed concurrently to resolve the parties' respective challenges to proposed expert testimony, the Court has qualified Duke's "standard of care" expert, Theresa Bowyer ("Bowyer"), who is a licensed registered nurse with experience as a nursing director at a nursing home, only with respect to (a) hands-on, non-skilled care rendered to Edgar by caregiver Lula Woods, and (b) hiring, training, supervising and staffing decisions by Daria McCord Robinson, LPN. Bowyer has been determined incompetent to testify regarding pre-admission assessments, admission decisions, and the administrative duties rendered by Beth

---

[9]*Pl.'s Resp.* (Doc. 76) at 6-7.

Donoghue, the administrator of Atria's assisted living facility.   Atria's proffered expert, Diane Bailey ("Bailey"), the administrator of an assisted living facility, has been determined competent to provide "standard of care" opinions regarding the facility administrator's admission assessments and decisions as well as the facility's hiring, training, supervising and staffing matters.

### B.    Duke's Expert Opinions

Because Duke's "standard-of-care expert has been qualified to testify  with respect to the non-specialist assistance rendered by Lula Woods to Edgar, the Court begins its assessment of Duke's evidentiary opposition to summary judgment by isolating the two pertinent  opinions rendered:

> (1) "In this case, the manner in which Ms. Woods' was dressing Mrs. Edgar, who had been classified by the facility as a 'high risk' for falls contributed directly to Mrs. Edgar's fall and her complete failure to act properly and follow procedure after she injured Mrs. Edgar was a complete violation of standards  first aid, and nursing practices."
>
> (2) "The information contained in these additional records, validates and supports by previous conclusion that Lula Woods was inadequately trained, not supervised and her actions caused the injuries to Mrs. Edgar."[10]

Construing the relevant evidence in the light most favorable to Duke, and drawing all reasonable inferences in her favor, the Court proceeds to analyze these expert opinions in order to ascertain the existence of any genuine issue of material fact on the question of liability.  Consistent with the proof requirements of the controlling state law in this case, Duke may avoid summary judgment only by presenting substantial evidence by an expert witness that Atria deviated from the established, appropriate standard of care and that the deviation or breach caused the injuries claimed.

---

[10]Affidavit of Theresa Bowyer, R.N. ("*Bowyer Aff."*) at 10 and 14 (*Pl.'s. Ex.* 14).

## 1. Assistance with "Dressing"

For its contention that Lula Woods did not breach any standard of care applicable to Edgar's actions in dressing herself,   Atria highlights undisputed evidence that Edgar's own primary physician, Dr. Walter Geary, approved her admission to Atria without indicating that she needed anything more than "supervision" in contrast to the closer assistance reflected by the  "needs assistance of 1" alternative.[11]          Additionally, Atria underscores Bowyer's deposition testimony that she "cannot provide any opinion that Lula Woods did or failed to do anything which led to Mrs. Edgar's fall", an assessment based on her review of "the report that had an investigation of the incident."[12]

In her affidavit prepared  in opposition to summary judgment, Bowyer explained as follows her critical opinion of Woods' conduct prior to Edgar's fall and noted that she informed that opinion by "additional information from Lula Woods' personnel and training records and copies of the Atria incident reports":

> ". . . an elderly woman assessed as a ' high fall risk' is asked to put one leg at a time, stepping into her pants, while balancing on one foot, knowing she already is unstable and has balance problems, asking her to balance while stepping into her clothes  is a gross deviation from the protocol for assistance with dressing." [13]

Careful scrutiny of Bowyer's expert testimony fails to disclose any substantial evidence of the established standard of care which should have guided Woods in dressing Edgar; absent proof for

---

[11]See *Geary Dep.* (*Def.'s Ex.*9).

[12]*Def.'s Br.* at 6-7, citing *Bowyer Dep.* at 104-106.

[13]*Bowyer Aff.* at 13-15.  Whether Bowyer's classification of Edgar as a "high fall risk" finds substantial support in the evidence admitted on this record is dubious;  Duke's inability to establish any pertinent standard of care, however, makes it unnecessary to decide the question.

the controlling standard, there can be no substantial evidence of Woods' deviation from the standard.[14]

### 2.   *Inadequate training and supervision*

From her evaluation of Woods' training records,  Bowyer concludes that Woods  did not view videotapes on the topic of "Falls", and there is no indication that she was "ever evaluated for competency" - a fact Bowyer underscores as " a violation of the standard of care and diligence by a similarly situated living facility."  In Bowyer's expert opinion,  "hands on training on how to assist anyone who needs assistance with ambulation, dressing and transferring from a bed, to toilet, into a car or help with bathing is required.  This is not something that can be learned from watching a video tape."[15]  This contention merits no discussion because Bowyer's expressed opinions lack any authoritative reference to the established standard of care for the training in question.  At most, Bowyer's opinion relates her conviction that Atria's method of training differs from her preferred

---

[14]Bowyer cites  to a textbook, the *Merck Manual on Health and Aging,* for the general proposition that *"*most falls occur while a person is moving" and  movement can be hazardous for elderly patients.  She then opines that  "asking [Edgar] to balance while stepping into her clothes is a gross deviation from the protocol for assistance with dressing" (*Bowyer Aff.* at 15).  Patently deficient in her testimony, however, is any documentation for the  proper protocol – established by some  regulatory, professional, or otherwise authoritative guideline – for assistance with dressing. The same deficiency makes irrelevant Bowyer's unbuttressed opinions that Woods should not have moved Edgar after her  fall.(*Bowyer Aff.* at 10, 16).  Bowyer does cite authority – a recommendation from the  Joint Commission on Accreditation of Healthcare Organizations  – for her opinion that Atria's failure to implement a fall screening and prevention program at the time of Edgar's residency violated  the recommended standard of care.  (*Bowyer Aff.* at 13).  Assuming *arguendo* the sufficiency of this specific testimony to create a disputed issue of fact, Bowyer provides no causal link between this alleged breach and Edgar's injury.  Indeed, as discussed, *infra*,  this summary judgment record is wholly deficient for substantial evidence on the critical element of causation with respect to any expert opinions of standards of care breached by Atria.

[15] *Bowyer Aff.* at 13-14, referencing Woods' training record admitted as *Pl.'s Ex. 20*.

9

and actual method in her experience as a nursing director at a long-term care facility. [16]

      **C.     No Evidence of Causation**

      Even if Duke's expert evidence could be construed liberally to create a disputed issue of fact with respect to Atria's deviation from any established standard of care applicable to its employees' acts or omissions, summary judgment would still be warranted, as now discussed, based on Duke's inability to establish by expert testimony sufficient evidence of any causal connection between any such deviation and plaintiff's injury.  Such a failure in the plaintiff's burden of proof is fatal to recovery on her AMLA claim.[17]

      The plaintiff in an AMLA action must prove by substantial evidence that the alleged wrongdoing "probably caused the injury."  *See Cain v. Howorth*, 877 So. 2d 566, (Ala. 2003); *Vaughn v. Oliver,* 822 So. 2d 1163, 1168 (Ala. 2001).  As the Alabama Supreme Court explained in *McAfee v. Baptist Medical Center*, 641 So. 2d 265, 267 (Ala. 1994):

---

[16]Likewise deficient and thus not probative is Bowyer's opinion that Atria's "failure to hire sufficient staff, train the staff properly, supervise the staff and properly staff the facility resulted in violations of not only the facility's own policy and procedures regarding falls and fall risks, but also generally accepted nursing practices and methodology regarding falls, the manner in which assistance with ADLs should be provided pursuant to a plan of care." (*Bowyer Aff.* at 9).

[17]*See Celotex*, 477 U.S. at 324-326 (if defendant movant draws attention to absence of support for essential element of plaintiff nonmovant's claim, plaintiff is by definition precluded from prevailing at trial and summary judgment may be granted, unless in response plaintiff nonmovant sets forth facts which could enable reasonable trier of fact to conclude that essential element is proven); *see, e.g., Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1294 (11th Cir. 2005) ("Summary judgment must be granted if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."); *McDowell v. Brown, 392 F.3d 1283* (11th Cir. 2004) (affirming summary judgment against plaintiff after requisite expert testimony excluded on *Daubert* grounds); *Morisky v, Broward County*, 80 F.3d 445, 448-449 (11th Cir. 1996) (summary judgment granted against Americans with Disabilities Act plaintiff who failed to submit evidence that defendant was aware of plaintiff's disability; defendant's adverse action could not therefore have resulted because of disability).

> The proof must go further than merely show that an injury could have occurred in an alleged way– it must warrant the reasonable inference and conclusion that it did so occur as alleged–and the inference merely that it could so occur does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.

(internal quotations and citations omitted).   In this case, Duke's expert opinions fail to appreciate the critical difference between temporal and causal relationships, as recently emphasized  in *McClain v. Metabolife International, Inc.*, 401 F. 3d 1233, 1243 (11th Cir. 2005):

> The *post hoc ergo proctor hoc* fallacy assumes causality from temporal sequence. It literally means "after this, because of this." Black's Law Dictionary 11886 (7th ed. 1999).  It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.

Atria's summary judgment motion highlighted the insufficiency of causation evidence by declaring, *inter alia*:  "[t]here is no evidence that anything Atria did or failed to do caused Thelma Edgar to fall on the morning of September 3, 2002." Atria's supporting brief also squarely placed into controversy the requisite showing of causation by referencing evidentiary support for its claimed entitlement to summary judgment because  Duke "has failed to establish evidence of causation."[18]

---

[18]*Def.'s Mot*. at 4, ¶ 9 - Narrative Summary of Undisputed Facts.  *Def.'s Br*. at 17;  s*ee, e.g.*, *Def.'s Br*. at 4 ("Moreover, the plaintiff must demonstrate the defendant collectively and/or individually proximately caused the alleged injuries."); at 10  ("...*no evidence exists of any causal connection between the allegations ['relating to "short-staffing" and insinuating that Atria was somehow not providing the level of care provided ] and the alleged injuries);*   at 11 ("Plaintiff's expert has opined that Thelma Edgar should not have been admitted to an assisted living facility, . . . Even if plaintiff's expert's testimony on this issue was admissible (and it clearly is not), the opinion would be entitled to no weight, and certainly would not constitute "substantial evidence" to withstand summary judgment, in that it is contradicted by the great weight of the evidence, and even plaintiff's own expert's testimony.  *Additionally, there appears no causal connection between this allegation and any alleged injury);*  at 15 *(*"...even if some claim could be brought on these allegations [of improper compliance with regulations regarding admission criteria]*, and some causal (rather than "temporal") connection could be established,* defendant is entitled to summary
(continued...)

Notwithstanding Atria's emphasis on the deficient proof of causation, Duke's response in opposition fails altogether to acknowledge and attempt to refute the contention. [19] Consistent with its duty to examine the merits irrespective of the nonmovant's failure to address a summary judgment contention, the Court has carefully examined any admissible testimony proffered by Duke's expert in her deposition,[20] expert report,[21] affidavit,[22] and hearing testimony. Only her affidavit contains any plausible testimony relevant to causation, and the Court has discussed its

---

[18](...continued)
judgment ....).; at 16 ("Because plaintiff's expert's testimony, even if admissible, does not refer to any conduct which could even possibly have resulted in injury, no claim or damages are recoverable in this action). (emphasis supplied; case citations omitted).

[19]At the evidentiary hearing Duke's counsel explained this omission by indicating her focus on Atria's perceived, principal challenge to the qualifications of her expert. Given the clear and repeated references in Atria's brief to causation as an essential element of proof, this explanation is curious. Counsel also indicated her intent to establish the requisite element at trial by testimony from Edgar's treating physicians. Because a successful summary judgment motion obviates the need for trial, the nonmovant simply does not enjoy the luxury of withholding any material evidence in opposition which would demonstrate a genuine dispute of material fact on an essential element of proof for the substantive claim of liability. Finally, as evidence of causation, counsel cited generally the following proffered submissions (Doc. 77, April 19, 2005): (1) Affidavit of Lula Woods (Pl.'s Ex. 6); (2) Affidavit of Linda Snead (Pl.'s Ex. 7); (3) Atria Incident Report for 9/3/2002 (Pl.'s Ex. 9) ; (4) Nursing intake notes from Baptist Medical Center 9/3/2002 (Pl.'s Ex. 10); (5) Diagnostic notes from Baptist Medical Center 9/3/2002 (Pl.'s Ex. 11); and (6) Medical Records of Dr. Walter Geary. Though some of these exhibits have been struck, assuming *arguendo* the admissibility of all these records, scrutiny by the Court does not reveal the substantial evidence necessary for proof of causation. Viewed most favorably to Duke, these submissions merely detail the events surrounding Edgar's fall, her injuries, and treatment. They are woefully deficient in creating a genuine issue of material fact with respect to causation.

[20]Ms. Bowyer's deposition testimony was admitted in its entirety at the May 5, 2005 evidentiary hearing as *Def.'s Ex. 3.*

[21]See *Preliminary Synopsis of record review: Thelma Edgar* submitted as *Pl.'s Ex. 10*, Doc. 71.

[22]Bowyer Affidavit is submitted as *Pl.'s Ex. 14*, Doc. 77 and as *Pl.'s Ex. 10* in Doc. 71.

deficiencies.

"Summary judgment cannot be avoided...based on hunches unsupported with significant probative evidence." *Raney v. Vinson Guard Serv., Inc*. 120 F. 3d 1192, 1198 (11th Cir. 1997); *Bevill v. UAB Walker College*, 62 F. Supp. 2d 1259, 1268 (N.D. Ala. 1999)("Bare speculation based on loose construal of the evidence will not satisfy the non-movant's burden."); *Bailey v. Allgas, Inc*., 284 F. 3d 1237, 1243 (11th Cir. 2002).

## V.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, it is hereby **ORDERED** that *Atria, Inc.'s Motion for Summary Judgment* (Doc. 60, March 30, 2005) is **GRANTED**.

A separate judgment will be entered.

Done this 27th day of June, 2005.

/s/ Delores R. Boyd
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE

13